## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## GREENSBORO DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LAURENCE A. CRINK and | ) | Case No. 08-10824 |
| JANET MARIE CRINK, | ) | |
| | ) | |
| Debtors. | ) | Chapter 7 |
| _____ | ) | |

## MEMORANDUM OPINION

This matter came before the Court on February 3, 2009 upon the Motion of Bankruptcy Administrator for Dismissal of Case Pursuant to Sections 707(b)(1) and 707(b)(3) (the "Motion to Dismiss") filed by the United States Bankruptcy Administrator on September 5, 2008.  At the hearing, John H. Boddie appeared on behalf of the above-referenced debtors (the "Debtors") and Robert E. Price, Jr. appeared on behalf of the Bankruptcy Administrator.  After consideration of the Motion to Dismiss, the evidence presented at the hearing, the arguments of the parties, and the relevant law, the Court will grant the Motion to Dismiss.

## I.  JURISDICTION

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), which this Court has the jurisdiction to hear and determine.

## II.  FACTS

The Debtors and their youngest daughter moved to North Carolina from California in 2003. They sold their California home for approximately $700,000. The Debtors moved so that Mr. Crink could accept a position in Greensboro as Senior Executive Vice President of DeCoro USA Ltd. ("DeCoro"), the American subsidiary of an Italian-owned furniture company based in China.

In August of 2003, the Debtors purchased a house at 2807 Lake Forest Drive, Greensboro, North Carolina (the "House"). At the time that the Debtors purchased the House, they were debt free. Title to the House was put in the name of the Crink Family Trust, a living trust that the Debtors established in 2002 or 2003. The House is located in New Irving Park, a prestigious Greensboro neighborhood. It has just less than 5,000 square feet of living space with five bedrooms and four and one-half bathrooms. The Debtors purchased such a large house to accommodate future children and Mr. Crink's mother in her old age, as well as to entertain guests during the annual furniture market in nearby High Point, North Carolina.

The House was purchased for $680,000.00. The Debtors made a $30,000.00 down payment and financed the remainder of the purchase price through a $550,000.00 fixed rate loan secured by a first priority deed of trust on the House and a $100,000.00 variable rate, interest-only loan secured by a second priority deed of trust on the House. Shortly after they moved in, the Debtors discovered two major problems: (1) drainage issues that necessitated the installation of a French drainage system, and (2) decay in load-bearing columns at the front of the House. The Debtors obtained a $50,000.00 variable rate, interest-only loan to pay for the costs of these repairs, and they secured the loan with a third priority deed of trust on the House.

2

In October 2005, the Debtors' debt was limited to the three deeds of trust on the House.[1] Mr. Crink testified that he believed that the Debtors would be able to pay off all three mortgages within five years, primarily due to an anticipated initial public stock offering by DeCoro.  On October 25, 2005, Mr. Crink received written notice that his employment with DeCoro would be terminated effective November 25, 2005.  DeCoro also notified Mr. Crink that it would enforce the non-competition provision and the non-solicitation provision (the "Restrictive Provisions") contained in his January 26, 2003 employment agreement.  The non-competition provision prevented Mr. Crink from selling items similar to those sold by DeCoro for one year, and the non-solicitation provision prevented him from calling on DeCoro's customers for two years.

Immediately after Mr. Crink was terminated, the Debtors listed the House for sale with a real estate broker.  Mr. Crink believed that the House would sell and that the Debtors would then move into a rental home for approximately $1,800.00 per month, allowing the Debtors to address the rest of their debt.  However, the House did not sell.

In early 2006, Mr. Crink was offered a position with a Chinese furniture company that would have provided annual compensation of $225,000.00 and the opportunity for a $300,000.00 bonus.  He was prevented from accepting the position by the Restrictive Provisions.  In April of 2006, Mr. Crink was approached by a second Chinese furniture company that offered him a position providing annual compensation of $348,000.00 plus a bonus.  Again, the Restrictive Provisions prevented him from taking the position.  In May or June of 2006, Mr. Crink consulted attorneys at the law firm of Smith Moore Leatherwood LLP about the Restrictive Provisions. His attorneys did not encourage Mr. Crink to sue DeCoro concerning relief from the Restrictive

---

[1]According to the Debtors' 2005 tax return, they had $253,746.00 in income that year.

Provisions.  By the Spring of 2007, Mr. Crink determined that, rather than litigate, he would wait until the Restrictive Provisions ended in November of 2007 to find a new position in the furniture industry.

When the Restrictive Provisions expired in November of 2007, Mr. Crink identified a position with PeopLoungers LLC, a furniture manufacturing company based in Tupelo, Mississippi.  He interviewed in December of 2007 and accepted a position as Executive Vice President in January of 2008.   Mr. Crink's annual salary at PeopLoungers began at $200,000.00.

Beginning on June 10, 2007, the House was listed with a third real estate broker, Leslie Hecht.  The House was listed for $737,000.00 based on neighborhood comparables, the original purchase price, and the repairs that the Debtors made.  The House was shown approximately 45 times, generating two offers.  The Debtors determined one of the offers to be a "hoax."  The other offer, made in March of 2008 for $682,500.00, came from Rik and Brenda Gates, who were relocating from New York.  The Debtors did not accept the offer because it was contingent on the Gates selling their New York home.  According to Ms. Hecht, it was unlikely the contingency would have been fulfilled.  On May 20, 2008, the Gates made a second offer of $670,000.00.  At that time, the Debtors owed approximately $660,000.00 on their three mortgages.  After paying expenses associated with the sale, the Debtors realized they would end up $38,000.00 to $40,000.00 short of paying off their debts associated with the House.  The Debtors asked their mortgage lender, Wells Fargo, whether it would forgive any deficiency from the sale.  Wells Fargo responded that it would take up to twelve weeks to make a decision.  The Gates refused to wait and withdrew their offer.  After realizing that they would not be able to sell

the House for enough to pay off their mortgages,[2] the Debtors decided to file bankruptcy.

On May 31, 2008, the Debtors filed their Chapter 7 bankruptcy petition. On September 5, 2008, the Bankruptcy Administrator filed the Motion to Dismiss, which came on for final hearing on February 3, 2009.

### III. DISCUSSION

The Bankruptcy Administrator seeks dismissal of the Debtors' case pursuant to Section 707(b)(3) of the Bankruptcy Code, which is one of the changes to the Code produced by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "BAPCPA"). Abuse of the Bankruptcy Code occurs under Section 707(b) when a debtor attempts to use the provisions of the Code to get a "head start" rather than a "fresh start." Green v. Staples (In re Green), 934 F.2d 568, 570 (4th Cir. 1991) (providing that Section 707(b) allows "a bankruptcy court to deal equitably with the situation in which an unscrupulous debtor seeks to gain the court's assistance in a scheme to take unfair advantage of his creditors."); In re Schmonsees, No. 01-10844, slip op. at *2 (Bankr. M.D.N.C. Sept. 21, 2001) (2001 WL 1699664) ("Section 707(b) should be applied in a manner in which a truly needy debtor is allowed a fresh start, while denying a head start to the abusers."). For Section 707(b) to be applicable, the debts in the case must be primarily consumer debts, and it must be shown that granting the debtor a Chapter 7 discharge would involve an "abuse" of the provisions of Chapter 7. It is undisputed that the debts in this case are primarily consumer debts. The moving party, in this case the Bankruptcy Administrator, has the burden of proving abuse pursuant to Section 707. In re Sale, 397 B.R.

---

[2]Ms. Hecht testified that the value of the House today is likely between $500,000.00 and $599,999.00 based on recent sales. On their schedules, the Debtors assigned a value of $478,000.00 to the House, based on its tax value.

281, 284 (Bankr. M.D.N.C. 2007); In re Quarterman, 342 B.R. 647, 652 (Bankr. M.D. Fla. 2006)

(citing In re Heath, 182 B.R. 557, 561 (B.A.P. 9th Cir. 1995)).

Section 707(b)(2), also known as the "means test," provides a presumption of "abuse" if

a debtor's disposable income over 60 months exceeds a threshold amount.[3]  Section 707(b)(7)

exempts debtors whose income is below the median of their state from the means test.  In this

case, the Bankruptcy Administrator does not assert that the Debtors failed the means test.  While

the Debtors are well above the median income for a family of three[4] in North Carolina, their

expenses are such that the Debtors have negative disposable monthly income, and there is no

presumption of abuse under Section 707(b)(2).

The inquiry into abuse does not, however, end with Section 707(b)(2).  Section 707(b)(3)

provides a basis for dismissal even when no presumption of abuse arises under the means test.

In re Lipford, 397 B.R. 320, 326 (Bankr. M.D.N.C. 2008).  Section 707(b)(3) provides that in

determining whether abuse exists under Section 707(b)(1), a court shall consider:  "(A) whether

the petition was filed in bad faith; or (B) [whether] the totality of the circumstances … of the

debtor's financial situation demonstrates abuse."  11 U.S.C. § 707(b)(3).  The Bankruptcy

Administrator has not alleged abuse under Section 707(b)(3)(A) based on bad faith, so the only

question before the Court is whether there is a basis for dismissal under Section 707(b)(3)(B)

---

[3] Section 707(b)(2)(A)(I) provides:  "In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of-- (I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,575, whichever is greater; or (II) $10,950."

[4] The Debtors listed two children as dependants on Schedule I and listed a household size of four on their Form B22A.  Mr. Crink has an older daughter from a previous relationship. However, Mr. Crink's oldest daughter spent only about three weeks in Greensboro in 2008.  At the hearing, the Debtors admitted that the older daughter was not their dependent and that their correct household size is three.

based on consideration of "the totality of the circumstances . . . of the debtor's financial situation."

<u>A.  Should a Debtor's Ability to Pay Be Considered as Part of the Totality of the Circumstances Test?</u>

At the hearing on the Motion to Dismiss, the Debtors objected to the admission of any evidence related to their ability to pay their creditors because, they argued, BAPCPA restricts any analysis of their ability to pay to Section 707(b)(2) and therefore their ability to pay cannot be considered under Section 707(b)(3).  The Debtors argue that BAPCPA effectively created three alternative tests for "abuse":  (1) the ability to pay under Section 707(b)(2); (2) bad faith under Section 707(b)(3)(A); and (3) the totality of the debtor's financial circumstances under Section 707(b)(3)(B).  Furthermore, the Debtors contend that the analysis of "abuse" under each test should be separate and distinct.  The resulting conclusion that the Debtors would have the Court reach is that a debtor's ability to pay is the exclusive jurisdiction of the "means test" in Section 707(b)(2), and therefore a debtor's ability to pay should not be considered under the totality-of-the-circumstances test of Section 707(b)(3)(B).

**1.  Plain Language**

When interpreting a statute, a court starts with its plain language.  <u>U.S. Dept. of Labor v. North Carolina Growers Ass'n</u>, 377 F.3d 345, 350 (4th Cir. 2004).  When the language is plain, a court's sole function, at least where the disposition required by the text is not absurd, is to enforce the statute according to its terms.  <u>Id.</u>  In order to determine whether the language is plain, a court will consider "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  <u>Newport News Shipbuilding and Dry Dock Co. v. Brown</u>, 376 F.3d 245, 248 (4th Cir. 2004) (quoting <u>Robinson v. Shell Oil Co.</u>, 519

U.S. 337, 341 (1997)).

The Debtors' interpretation of Section 707(b), which excludes consideration of their ability to pay from the "totality of the circumstances … of the debtor's financial situation" test, does not comport with the plain meaning of the statute.  It is difficult to envision a situation where the totality of a bankruptcy debtor's financial situation does not include the debtor's ability to repay her debts.  A debtor's income and expenses, and the resulting ability to pay, are central to the assessment of a debtor's financial situation.  In re Booker, 399 B.R. 662, 666 (Bankr. W.D. Mo. 2009).  To look at all the factors that make up a debtor's financial situation except for her ability to pay would be to look at something less than the totality of the debtor's circumstances, which is not what Section 707(b)(3)(B) requires.  If a court is to examine the totality of a debtor's financial situation, as it must, then it is required to consider the debtor's ability to pay.[5]

The Debtors' interpretation of Section 707(b) fails to recognize that the means test of Section 707(b)(2) simply provides a presumption, "an easily applied formula for determining when the court should presume that a debtor is abusing the system by filing a chapter 7 petition." In re Fowler, 349 B.R. 414, 420 (Bankr. D. Del. 2006) (emphasis in original).  It must be noted that "the presumption of abuse is just that, a presumption."  In re Lenton, 358 B.R. 651, 660 (Bankr. E.D. Pa. 2006).  Presumptions are useful because they typically avoid litigation.  See Fowler, 349 B.R. at 420.  The means test is useful because it automatically disqualifies from Chapter 7 those debtors who "fail" it; they are presumed to have the ability to repay some of

---

[5]Some courts have held that the debtor's ability to pay alone may be determinative under a Section 707(b)(3) analysis.  See In re Calhoun, 396 B.R. 270, 275-76 (Bankr. D.S.C. 2008); In re Henebury, 361 B.R. 595, 607 (Bankr. S.D. Fla. 2007).

their debts in a Chapter 13 case.  The presumption steers such debtors away from Chapter 7

without the need to litigate Section 707(b) motions.  However, it also must be noted that a

Chapter 7 case may be abusive even though it is not <u>presumed</u> to be abusive under Section

707(b)(2).  When a debtor "passes" the means test, the presumption of abuse does not arise, but

the Bankruptcy Administrator may still pursue dismissal under Section 707(b)(3).  <u>In re Walker</u>,

No. 05-15010, slip op. at *8 (Bankr. N.D. Ga. May 1, 2006) (2006 WL 1314125).  To hold that

the means test is the exclusive domain of an ability-to-pay analysis would be to elevate it from a

presumption to an actual test for abuse, a result that is in conflict with the text of BAPCPA.

Section 707(b)(2) functions as an initial filter, disqualifying some debtors from Chapter 7

because they have an ability to pay.  Those debtors that pass through this initial filter remain

subject to a full analysis  under Section 707(b)(3).  To restrict this analysis under Section

707(b)(3) would be contrary to the text of the statute and the intent of BAPCPA.[6]

Consider the application of Section 707(b)(3)(B) to the below median income debtor.

Debtors with below median incomes are exempted from the means test by Section 707(b)(7).

The effect of this exemption is that the means test cannot be used to determine the ability of a

below median income debtor to pay.  If the debtor's ability to pay is not considered under

Section 707(b)(3)(B), then there would be no mechanism under BAPCPA for a court to consider

---

[6]"The heart of [BAPCPA's] consumer bankruptcy reform consists of the implementation
of an income/expense screening mechanism ('needs-based bankruptcy relief' or 'means testing'),
which is intended to ensure that debtors repay creditors the maximum they can afford."   <u>In re</u>
<u>Kibbe</u>, 361 B.R. 302, 314 (B.A.P. 1st Cir. 2007) (citing H.R. Rep. No. 109-31, at 2 (2005)).
Many courts have noted a clear Congressional intent in BAPCPA to require debtors to pay back
as much as they could afford.  <u>See</u> <u>Pak v. eCast Settlement Corp. (In re Pak)</u>, 378 B.R. 257, 265
(B.A.P. 9th Cir. 2007) (Klein, J., concurring); <u>In re Briscoe</u>, 374 B.R. 1, 8 (Bankr. D. Col. 2007);
<u>In re Arsenault</u>, 370 B.R. 845, 850 (Bankr. M.D. Fla. 2007); <u>In re Meek</u>, 370 B.R. 294, 304 n.31
(Bankr. D. Idaho 2007).

the ability of a below median income debtor to pay her creditors in making a determination of
abuse.  Such a result is inconsistent with the intent of Congress to require that those debtors with
an ability to pay do so.  In fact, the argument that ability to pay should not be considered for
below median income debtors has been rejected by several courts.  In re Pennington, 348 B.R.
647, 649-50 (Bankr. D. Del. 2006); In re Paret, 347 B.R. 12, 15-16 (Bankr. D. Del. 2006); In re
Pak, 343 B.R. 239, 242-44 (Bankr. N.D. Cal. 2006).  The alternative is to apply Section
707(b)(3)(B) in two different ways: (1) considering the ability of a below median debtor to pay
and (2) excluding consideration of the ability of an above median debtor to pay.  Nothing in the
text of the statute indicates that Congress intended such a result.  Had Congress intended to
subject above and below median income debtors to different Section 707(b)(3)(B) standards,
then it could have done so.[7]

　　　　Finally, it is important to note that every other court to have considered this issue has
held that a debtor's ability to repay her creditors plays some role when applying the totality-of-
the-circumstances test of Section 707(b)(3)(B).  See, e.g., Booker, 399 B.R. at 666-67; In re
Johnson, 399 B.R. 72, 77 (Bankr. S.D. Cal. 2008); In re Baeza, 398 B.R. 692, 697-98 (Bankr.
E.D. Cal. 2008); In re Vogeler, 393 B.R. 240, 243 (Bankr. D. Kan. 2008); In re Wolf, 390 B.R.
825, 833 (Bankr. D.S.C. 2008); In re Budig, 387 B.R. 12, 16-17 (Bankr. N.D. Iowa 2008); In re
Schubert, 384 B.R. 777, 780 (Bankr. S.D. Ohio 2008); In re Walker, 383 B.R. 830, 838 (Bankr.
N.D. Ga. 2008); In re Stewart, 383 B.R. 429, 433 (Bankr. N.D. Ohio 2008); In re Beckerman,
381 B.R. 841, 845 (Bankr. E.D. Mich. 2008); In re Sullivan, 370 B.R. 314, 320-21 (Bankr. D.

---

[7] For example, Section 707(b)(7) exempts below median income debtors from the means test.
A similar provision could have been added exempting the consideration of an ability to pay from
the Section 707(b)(3)(B) analysis for above median income debtors.

Mont. 2007); <u>In re McUne</u>, 358 B.R. 397, 399 (Bankr. D. Or. 2006); <u>Lenton</u>, 358 B.R. at 663.[8]

### 2. Pre-BAPCPA Precedent

The phrase "totality of the circumstances of the debtor's financial situation" is not

defined in the Bankruptcy Code.  However, pre-BAPCPA cases are still instructive for

interpreting Section 707(b)(3), <u>In re dePellegrini</u>, 365 B.R. 830, 832 (Bankr. S.D. Ohio 2007); <u>In

re Pfiefer</u>, 365 B.R. 187, 191 (Bankr. D. Mont. 2007), and pre-BAPCPA precedent provides

assistance in giving meaning to the phrase "totality of the circumstances."  <u>See</u> <u>Lipford</u>, 397 B.R.

at 327.  Under the pre-BAPCPA version of Section 707, there was no Section 707(b)(2) means

test and no Section 707(b)(3).  Pre-BAPCPA, Section 707(b) simply provided that a court could

dismiss a Chapter 7 case if it found that granting relief would be a "substantial abuse," a term

that was not defined in the pre-BAPCPA Bankruptcy Code.[9]  As such, the courts were left to

devise their own tests for substantial abuse.

The Fourth Circuit, in <u>Green</u>, 934 F.2d 568, adopted a "totality of the circumstances" test

for substantial abuse that involved the evaluation of several factors in order to determine if a case

should be dismissed.  <u>Id.</u> at 572.  In formulating the test, the court noted that "Section 707(b)

reflects the tension between the fundamental policy concern of the Bankruptcy Code, granting

---

[8] While <u>In re Nockets</u>, 357 B.R. 497, 506 (Bankr. E.D. Wis. 2006), is sometimes cited for the proposition that a debtor's ability to pay should not be considered in a Section 707(b)(3)(B) analysis, this is not the case.  <u>Nockets</u> simply holds that more than an ability to pay is required to demonstrate abuse under Section 707(b)(3)(B).  <u>Id.</u> at 507.

[9] BAPCPA adopted a lower standard--"abuse"--as opposed to the pre-BAPCPA standard of "substantial abuse."  <u>Lipford</u>, 397 B.R. at 327 ("Unlike the pre-BAPCPA version, § 707(b)(3) does not require a showing of 'substantial abuse,' but a lower standard of 'abuse.'");  <u>In re Mondragon</u>, No. 05-10665, slip op. at *1 (Bank. D.N.M. Aug. 24, 2007) (2007 WL 2461616); <u>In re Mestemaker</u>, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).

the debtor an opportunity for a fresh start, and the interest of creditors in stemming abuse of

consumer credit." Id. at 571.  Green rejected the proposition that a case could be dismissed

pursuant to pre-BAPCPA Section 707(b) based solely on a debtor's ability to pay.  Id. at 572.

Instead, Green held that in determining substantial abuse, courts should look at a debtor's ability

to pay along with the following factors:

> (1)  Whether the bankruptcy petition was filed because of sudden illness,
> calamity, disability or unemployment;
> (2)  Whether the debtor incurred cash advances and made consumer purchases far
> in excess of his ability to repay;
> (3)  Whether the debtor's proposed family budget is excessive or unreasonable;
> (4)  Whether the debtor's schedules and statement of current income and expenses
> reasonably and accurately reflect the debtor's true financial condition; and
> (5)  Whether the petition was filed in good faith.

Id.  The Fourth Circuit also stated "that the majority of the cases hold that the debtor's ability to

repay is the primary factor to be considered."  Id.  Section "707(b)(3) incorporates a 'totality of

the circumstances' standard, which courts previously employed as the standard for determining

whether to dismiss a debtor's chapter 7 proceeding based on 'substantial abuse' under

pre-BAPCPA § 707(b)(2)."  Mondragon, No. 05-10665, slip op. at *1 (Bankr. D.N.M. Aug. 24,

2007) (2007 WL 2461616); see Green, 934 F.2d at 572.  Thus, Green remains instructive in an

analysis pursuant to new Section 707(b)(3).  See Mondragon, slip op. at *1.

### 3.  Legislative History

The Debtors argue that the Congressional Record suggests that, by adopting the means

test, Congress intended to exclude consideration of a debtor's ability to pay from a Section

707(b)(3) analysis.  But no clear indication of Congressional intent can be gleaned from the

legislative history.  Conflicting statements exist.  Cf. 151 Cong. Rec. S1842-43 (March 1, 2005)

("Some have attempted to criticize this commonsense safeguard as somehow taking away

12

bankruptcy protection.  Let me be clear.  The means test does no such thing.  All it does is identify those who can repay at least some of their debts.  It makes certain they enter into a chapter 13 reorganization and repayment plan rather than let them simply walk away from their obligations, no matter how steep or outrageous.  . . .  The means test contained in this bill will provide a uniform standard to bankruptcy judges to evaluate the ability of bankruptcy filers to repay debts.") (statement of Sen. Hatch) with 151 Cong. Rec. S1787 (February 28, 2005) ("The means test helps the courts determine who can and cannot repay their debts and, perhaps, more importantly, how much they can afford to pay.") (statement of Sen. Hatch) (emphasis added). The Court will heed the words of the Supreme Court and the Fourth Circuit: "The intent of Congress as a whole is more apparent from the words of a statute than from a patchwork record of statements inserted by individual legislators and proposals that may never have been adopted by a committee, much less an entire legislative body, and this truth gives rise to 'the strong presumption that Congress expresses its intent through the language it chooses.'"  Sigmon Coal Co., Inc. v. Apfel, 226 F.3d 291, 304-05 (4th Cir. 2000) (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 432 n.12 (1987)).

The Court concludes that a debtor's ability to pay her creditors must be considered in the context of a Section 707(b)(3)(B) analysis.

B.  Does This Case Constitute an Abuse of Chapter 7 Pursuant to Section 707(b)(3)(B)?

In the Fourth Circuit, a review of the Green factors is necessary to a determination of abuse under Section 707(b)(3)(B).

**1. Excessive or Unreasonable Family Budget**

13

Courts look to the facts of a case to determine whether debtors have an excessive or unreasonable family budget.  The Bankruptcy Administrator argues that the Debtors' housing payment renders their budget unreasonable and that the House is too expensive.  In spite of the fact that they have tried to sell the House for the better part of three years, the Debtors now want to keep the House and pay the mortgage payments.[10]

A debtor's budget may be excessive or unreasonable based on a high mortgage payment. E.g., In re Moreland, No. 05-10519, slip op. at *5-6 (Bankr. M.D.N.C. Aug. 3, 2005) (2005 WL 1925460) (finding that mortgage payments of $2,604 on a $240,000 house with no equity, consuming a large percentage of their monthly income, was unreasonable; Shaw v. United States Bankr. Adm'r (In re Shaw), 310 B.R. 538, 541 (M.D.N.C. 2004) (finding that the debtors earned $7,804.11 in net monthly income and that a mortgage payment of $3,349 on a $415,000 house was unreasonable in that it manifested a desire to hold on to a station in life that seemed to precipitate the bankruptcy in the first place); Schmonsees, slip op. at *3 (holding that mortgage payments of $2,450 on a $290,000 four-bedroom home in an upscale neighborhood occupied by two people was excessive when the debtor and his non-filing spouse earned a net pay of $5,400 per month); In re Engskow, 247 B.R. 314, 316-17 (Bankr. M.D. Fla. 2000) (stating that mortgage, taxes, and insurance expenses of $2,184 were excessive when the debtor's net income was $3,548 and when the debtor did not include the income of his spouse on the schedules); United States Trustee v. Duncan (In re Duncan), 201 B.R. 889, 896 (Bankr. W.D. Pa. 1996) (finding a mortgage and utility expenses consuming 89% of the household budget was

_____

[10]According to their Statement of Intentions and their testimony at the hearing, the Debtors plan to retain the House.  Mrs. Crink testified that the House is not currently on the market.  However, the Debtors also indicated that they are two months behind on their mortgage payments.

unreasonable and unconscionable, considering the debtor was attempting to wipe out nearly $224,000 in unsecured indebtedness); cf. In re Hammed, No. 04-53282, slip op. at *5 (Bankr. M.D.N.C. April 22, 2005) (2005 WL 1321943) (finding that a $1,740 mortgage payment for a family of five that constituted 31% of the budget was not unreasonable); In re Parker, 04-12747, slip op. at *6 (Bankr. M.D.N.C. Jan. 25, 2005) (2005 WL 1288974) ("Given the length of time that the Debtor has owned her home, the size of her family, the relative cost of alternative housing, and the relatively modest living conditions of the Debtors, the Court is convinced that the Debtor did not inflate her homestead costs in an effort to live an indulgent and luxuriously lifestyle at the expense of her unsecured creditors.").

        In considering whether housing expense are excessive, due regard should be given to the size of the family, their reasonable needs, and the cost of alternative housing. Furthermore, a court should not unduly depreciate a debtor's long-standing, traditional ties to a homestead. See In re Miller, 335 B.R. 335, 342 (Bankr. E.D. Pa. 2005); In re Beitzel, 333 B.R. 84, 90 (Bankr. M.D.N.C. 2005); Moreland, slip op. at *5-6.

        In this case, the Debtors purchased the House in 2003 by borrowing $650,000.00. Shortly after they moved in, the Debtors borrowed an additional $50,000.00 to make repairs to the House, for a total initial indebtedness of $700,000.00. The House has five bedrooms, measures 5,000 square feet, and is situated in a prestigious neighborhood. The Debtors reside in the House with their younger daughter. According to the Debtors' schedules, the House is worth $478,000.00. Currently, the three mortgages on the House total approximately $660,000.00, so the Debtors have no equity in the House. The Debtors' total monthly mortgage payment according to Schedule J is $4,661.00, or approximately forty-six percent (46%) of the Debtors'

15

net monthly income.[11]  In addition, the Debtors' are currently spending $1,494.00 each month on utilities and home maintenance.[12]  Therefore, $6,155.00 of the Debtors' monthly net income is allocated toward housing expenses, which is approximately sixty-one percent (61%) of their total net monthly income.

The Court finds that the Debtors' housing expense is excessive.  First, the Debtors have a five-bedroom, 5,000 square foot home for a family of three.  Such a large amount of space is not needed.  Although the Debtors testified that they purchased a large house because they anticipated the need to accommodate future children and Mr. Crink's mother, those needs have not materialized.  Second, the Debtors do not have any long-standing traditional ties to their homestead, as the House was purchased in 2003.  Third, there is no equity in the House.  Finally, according to IRS guidelines, housing and utilities for a family of three in Guilford County, North Carolina should be no more than $1,479.00 per month,[13] which is less than one fourth of what the Debtors are currently spending.[14]  The Debtors can find suitable housing for their family that would cost significantly less than their current home.[15]

Other aspects of the Debtors' budget are unreasonable.   Schedule J lists home maintenance costs of $480.00 per month.  Mrs. Crink testified that this amount consists of lawn

---

[11]This calculation is based on $10,106.94 of net monthly income as shown on the Debtors' amended Schedule I.

[12]The Debtors list the following expenses on Schedule J: $284.00 on line 2a for "Electricity and heating fuel," $130.00 on line 2b for "Water and sewer," $450.00 on line 2c for "Telephone," $150.00 on line 2d for "Cable & Internet," and $480.00 on line 3 for "Home maintenance."

[13]This figure is based on IRS standards as of the petition date: a $444.00 per month non-mortgage expense and a $1,035.00 per month mortgage expense.

[14]In fact, Schedule J indicates that the Debtors spend more on utilities alone than what the IRS standards allow for mortgage and utility expenses.

[15]Mr. Crink testified that in October of 2005 the Debtors planned to sell the House and move into a rental home for approximately $1,800.00 per month.

16

care for $40.00 per week, a cleaning service for $100.00 every other week, extra expenses associated with trimming, and other miscellaneous repairs.  Schedule J also lists a $150.00 monthly expense for cable and internet.  Schedule J also shows a monthly expense of $450.00 for telephone service.  Mr. Crink testified that this amount includes three cell phones, a Blackberry, and two home phones.  Schedule J also includes monthly expenses of $300.00 for recreation and entertainment, an additional $60.00 for newspapers, books, and magazines, $100.00 for hair care, $100.00 for pet food, $300.00 for clothing, and $150.00 for laundry and dry cleaning.  The Court finds these expenses to be excessive for a family of three in North Carolina.

The Court concludes that the Debtors' budget is excessive and unreasonable.  This factor tends to show abuse.

### 2. Ability to Repay

The Bankruptcy Administrator argues that if the Debtors were to obtain more affordable housing, then they would be able to repay some of their debts.  An appropriate method of evaluating whether a debtor has the ability to repay his or her debts is to determine what amount of that indebtedness could be repaid in a hypothetical Chapter 13 plan.  In re Behlke, 358 F.3d 429, 437 (6th Cir. 2004) (substantial abuse found where the debtors could pay a dividend of 14% to 23%); Lipford, 397 B.R. at 328 (no bright line test); Shaw, 310 B.R. at 342 (dividend of 29% over 36 months was found to be a significant portion of the debtors' debts); In re Norris, 225 B.R. 329, 332 (Bankr. E.D. Va. 1998) (substantial abuse found where debtors had ability to repay 47% of debt through a Chapter 13 plan); In re Vianese, 192 B.R. 61, 71 (Bankr. N.D.N.Y. 1996) (finding substantial abuse where debtors could pay 19% to unsecured creditors in Chapter

17

13); In re Jarrell, 189 B.R. 374, 376 (Bankr. M.D.N.C. 1995) (substantial abuse indicated where debtors could pay 80% of debt over 36 months); In re Bryant, 47 B.R. 21, 23 (Bankr. W.D.N.C. 1984) (substantial abuse indicated where debtor, "with only a modicum of restraint," could pay 67% of his unsecured obligations over a 36-month period). But see Stewart, 383 B.R. at 435 (finding no abuse where debtor potentially could pay 35% over 60 months).

The greater the ability to pay, the more likely the finding of abuse. See In re Praleikas, 248 B.R. 140, 145 (Bankr. W.D. Mo. 2000) ("While it may be true that the higher the percentage of debt a Debtor could pay with future earnings, the more likely it is that a court would find substantial abuse, the converse is not true. Otherwise debtors would be rewarded for having more debt, rather than less. Instead of the percentage of debt, the determination of a debtor's ability to fund a Chapter 13 plan is based on a consideration of the debtor's ability to make a substantial effort in repaying his or her debts."). However, an ability to pay is not per se abuse. See In re Mondragon, slip op. at *6 (citing Mestemaker, 359 B.R. at 858) (examining the Green factors post-BAPCPA and noting that the ability of a debtor to pay at least a 25% dividend to unsecured creditors in a Chapter 13 case is not per se abuse under Section 707(b)(3)). However, the Mondragon court found that "a debtor's ability to repay 25% or more of his or her unsecured non-priority debts in a Chapter 13 plan is persuasive evidence" of abuse. Id. (emphasis added). The court noted that "a debtor's ability to pay is the primary factor even under pre-BAPCPA 'substantial abuse' cases." Id. Ultimately, an ability to pay tends to show abuse. See Lipford, 397 B.R. at 332-33.

The Court will evaluate the Debtors' ability to pay by considering their income and expenses as reported on their Schedules I and J. Lipford, 397 B.R. at 328. The Court must look

18

to the Debtors' future income and expenses, as well as evaluate their financial condition at the time of filing.  Id.  According to their original Schedule I, the Debtors had a combined average monthly income of $11,929.88.  Their Schedule J showed average monthly expenses totaling $12,044.00, leaving a net monthly income of negative $114.12.  The Debtors' amended Schedule I shows a decrease in their monthly income of $1,822.94,[16] leaving a net monthly income of negative $1,937.06.

It is appropriate for the Court to consider whether the expenses claimed by a debtor can be reduced significantly without depriving the debtor of adequate food, clothing, shelter, or other necessities of life.  In re McCain, No. 05-14382, slip op. at *3 (Bankr. M.D.N.C. June 16, 2006) (2006 WL 4458679) (citing Engskow, 247 B.R. at 317).  The Bankruptcy Administrator argues that the Court should reduce the Debtors' budget to a reasonable amount, using the IRS standards as a guide.[17]  As stated above, the Debtors' housing expenses are excessive, and they could obtain alternative housing for much less.  In addition, their transportation costs are excessive[18] and should be reduced.  As detailed above, several other items in the Debtors budget are excessive and should be reduced.  If the Debtors reduced their home mortgage, clothing, recreation, and miscellaneous expenses by fifty percent; reduced their utilities, home

---

[16]Mr. Crink testified that he agreed, effective in January of 2009, to a $25,000 per year salary reduction and to cover the cost of his own health care.  He did this because his current employer, PeopLoungers, is struggling, and the furniture manufacturing industry in general is "awful."

[17]The IRS standards used are those effective on the Debtors' petition date.

[18]In April of 2007, the leases on the Debtors' vehicles (a Jaguar and a BMW X5) were coming to an end.  On April 16, 2007, the Debtors agreed to a new lease on a 2007 Jaguar S-Type sedan for 36 months with a monthly payment of $663.27.  On April 17, 2007, the Debtors agreed to a new lease on a 2007 Jeep Wrangler for 36 months with a monthly payment of $482.19.  Their monthly vehicle lease payments total $1,145.46.  According to national IRS guidelines, the ownership cost of two vehicles should be $978.00 per month.

maintenance, transportation, and auto ownership expenses to the IRS standards; and reduced

their auto insurance expenses to their actual current premiums, they would have $2,185.44 per

month in disposable income.[19]  The Debtors admit that a Chapter 13 plan paid over 60 months

using such figures could pay a 39% dividend to their unsecured creditors, even allowing for a

$50,000.00 deficiency if the House were to be foreclosed upon.[20]  The Court's calculations show

an ability to pay a 42% dividend.[21]  This factor tends to show abuse.

### 3. Accuracy of Schedules

Inaccuracies on a debtor's schedules tend to show abuse.  See Lipford, 397 B.R. at 338.

The Bankruptcy Administrator demonstrated that the Debtors' household size was three, not four

as the Debtors had indicated on Schedule I and Form B22A.  He also demonstrated that the

Debtors did not list certain term life insurance policies for $1,000,000.00 each on Schedule B.

Finally, the Bankruptcy Administrator demonstrated that the Debtors' schedules fail to reflect a

series of monthly transactions involving Mr. Crink's older daughter.[22]  These inaccuracies or

---

[19]This figure is calculated by subtracting $7,921.50 of adjusted expenses from $10,106.94 of net income.  Over 60 months, this results in a $131,126.40 distribution to unsecured creditors.

[20]The sale of the House might produce a deficiency that would have to be repaid in a Chapter 13 plan, thereby diluting the payout to other creditors.  However, under Section 1325(a)(4), unsecured creditors must receive as much value in a Chapter 13 plan as they would have received in a Chapter 7 liquidation.  Here, unsecured creditors will receive significantly more in a Chapter 13 plan.  As one court put it, "less of something is better than more of nothing."  In re Blankenship, 398 B.R. 457, 463 (Bankr. N.D. Ohio 2008).

[21]Disposable income of $2,185.44 over 60 months is $131,124.40.  When that figure is divided by $306,900.00 of unsecured debt and the anticipated deficiency of $50,000.00 from the House, it demonstrates the ability of the Debtors to pay a 42% dividend.

[22]Mr. Crink pays child support for his older daughter through an odd arrangement involving a San Francisco apartment.  Mrs. Crink is the lessee of the San Francisco apartment and makes monthly rent payments of $1,350.00 to the landlord.  The Debtors have subleased the apartment to a third party.  The third party makes rent payments of $1,350.00 to a California bank account.  The mother of the older daughter receives child support payments from the California bank account.  According to Mrs. Crink, this arrangement is necessitated by the eccentricity of the landlord, and the Debtors do not derive any financial benefit from it.

20

omissions are insufficient for the Court to conclude that the schedules were materially inaccurate. This factor does not tend to show abuse.

### 4. Sudden Illness, Calamity, Disability, or Unemployment

The fact that a debtor does not file due to sudden illness, calamity, disability, or unemployment tends to show abuse. <u>See</u> <u>Lipford</u>, 397 B.R. at 339. The Debtors allege that they filed their bankruptcy due to the unemployment of Mr. Crink and the subsequent enforcement of the Restrictive Provisions by DeCoro. They also allege that the bankruptcy was caused by unexpected calamities in the form of (1) problems with the House that necessitated an additional debt of $50,000.00 and (2) the collapse of the housing market. None of these contentions are persuasive. While it is true that Mr. Crink lost his job, this event occurred over two years prior to the Debtors' bankruptcy. By the petition date, Mr. Crink had been employed for five months at a job that paid over $200,000.00 per year. Similarly, the Restrictive Provisions expired more than six months prior to the Debtors' bankruptcy, and the Debtors found out about the problems with the House over four years prior to filing. None of these occurrences are "sudden." <u>See</u> <u>Green</u> 310 B.R. at 538 (weighing this factor against a debtor facing unemployment about which she had significant warning). The collapse of the housing market is a macroeconomic factor that applies to everyone, not a calamity that is specific to the Debtors. The Debtors did not demonstrate that they filed due to any sudden illness, calamity, disability, or unemployment. This factor tends to show abuse.

### 5. Cash Advances and Consumer Purchases in Excess of Ability to Repay

A debtor's ability to repay consumer purchases and cash advances should be interpreted in a manner consistent with a debtor's reasonable expectations of repayment at the time that the

debt was incurred.  Beitzel, 333 B.R. at 91 (citing In re Vansickel, 309 B.R. 189, 211 (Bankr.

E.D. Va. 2004)); Moreland, slip op. at *7.  "Taken in its proper context, a court should examine

the nature of the debts incurred, if the debts were consistent with the debtor's financial status,

and whether there was an unexplained change in spending patterns–all of which must be

considered in light of whether a debtor is taking unfair advantage of creditors."  Beitzel, 333

B.R. at 91 (citing Vansickel, 309 B.R. at 211).  Paying the minimum balance on a credit card

does not demonstrate an ability to repay debts.  Moreland, slip op. at *8.  There is no dispute that

the debts in this case are primarily consumer debts, so the only issue is whether the Debtors'

purchases were in excess of their ability to repay.

 During 2006 and 2007, the Debtors had no income.  Their expenses were paid through

the use of savings, credit cards, and a series of loans from Steve Rachlin, a business associate of

Mr. Crink.  Beginning in the Fall of 2006, the Debtors' youngest daughter was enrolled at

Greensboro Day School, which has an annual tuition between $13,000.00 and $14,000.00.  The

Debtors financed the tuition by paying $1,200.00 each month.  During the 2007-2008 school

year, the daughter continued to attend Greensboro Day School.[23]  On at least one occasion, the

Debtors made a tuition payment using a credit card.

 By 2007, the Debtors had exhausted their savings and were solely using credit cards and

loans from Rachlin to pay their expenses.  Mr. Crink testified that the Debtors used four or five

credit cards in 2007 and 2008, with one American Express card used primarily for business and

the remainder used for personal or household expenses.  The record demonstrates that from

October of 2007 through May of 2008, the Debtors incurred charges of approximately

---

[23]The youngest daughter currently attends Greensboro Day School, but as of September
1, 2008, the tuition is being paid by Mrs. Crink's mother.

$17,000.00 for discretionary spending, mainly consisting of dining out, pet grooming services, and the purchase of non-essential goods and services. The Debtors testified that they became aware that they would be unable to continue to pay their credit card bills in February of 2008 because Mr. Crink's salary was not high enough and because the interest rates on their credit cards increased. Their credit card statements demonstrate that, from February through May of 2008, the Debtors charged over $7,700.00 in discretionary spending.[24] In sum, the Debtors used credit cards and loans from Rachlin to finance their consumer purchases at a time when they did not have the ability to repay the debt, apparently counting on Mr. Crink to obtain a job at some undetermined future date. As of the petition date, the Debtors had $256,900.00 in unsecured nonpriority debt. Of this amount, $140,000.00 consists of loans from Steve Rachlin. The remainder is almost all credit card debt. These facts tend to show abuse.

### 6. Good Faith

The Bankruptcy Administrator did not contend that the Debtors acted in subjective bad faith in connection with the filing of their Chapter 7 petition. However, the Bankruptcy Administrator does argue that the Debtors lived beyond their means up to and during the time of their bankruptcy and that this fact weighs against a finding of good faith. The Court agrees.[25]

---

[24]The Debtors' actual discretionary spending during this period is likely higher because the statements from several other credit cards of the Debtors were not introduced.

[25]While the Green factor of good faith may appear similar to the "bad faith" standard of abuse under Section 707(b)(3)(A), there is a difference. The Green factor of good faith is analyzed under Section 707(b)(3)(B), which requires a court to look to the totality of the circumstances of the debtor's financial situation. See In re Parada, 391 B.R. 492, 499 (Bankr. S.D. Fla. 2008) (only facts related to debtors' financial situation are relevant to Section 707(b)(3)(B) analysis). On the other hand, an analysis of bad faith under Section 707(b)(3)(A) may look outside a debtor's financial situation. See id. (factors unrelated to a debtor's financial situation are relevant to determining abuse under the bad faith standard of Section 707(b)(3)(A), such as eve-of-bankruptcy purchases, filing incomplete or false schedules, or failure to cooperate with the bankruptcy trustee).

The Debtors irresponsibly spent money on numerous non-essential goods and services during a two-year period in which they had no income.  Mr. Crink made no attempt to obtain a job in another industry, and Mrs. Crink, who had no employment restrictions, made no attempt to obtain employment at all.  They spent money that they did not have on a private school for their daughter, luxury vehicles for themselves, dining in expensive restaurants, pet care, and a host of other goods that they did not need and  services that they could perform for themselves or do without.  Their excessive and unreasonable budget demonstrates that they have continued this behavior post-petition.  They filed their Chapter 7 petition with the intention of paying nothing to their unsecured creditors.  Moreover, the Court concludes that the Debtors have not moved out of their House, which they tried for years to sell and has no equity, because to do so would have caused them to fail the means test under Section 707(b)(2).  These circumstances demonstrate that the petition was filed in bad faith.

### IV. CONCLUSION

The standard for granting a motion to dismiss pursuant to Section 707(b)(3) is no longer "substantial abuse," but rather just "abuse," a lower standard.  The Debtors have an excessive budget due to their unreasonable housing expenses.  They did not file their petition due to any sudden illness, calamity, disability, or unemployment, and, as explained above, they filed their petition in bad faith.  The Debtors have the ability to pay $2,185.44 per month to their unsecured creditors in a Chapter 13 plan, which would constitute a 42% dividend over five years.  Even if the "ability to pay" factor did not support a finding of abuse, the other Green factors are more than sufficient for the Court to conclude, based on the totality of the Debtors' financial circumstances, that allowing the Debtors to continue in a Chapter 7 would constitute an abuse of

24

the Bankruptcy Code within the meaning of Section 707(b)(3)(B).

This opinion constitutes the Court's findings of fact and conclusions of law.  A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

## **PARTIES TO BE SERVED**

Laurence A. Crink

Janet M. Crink

John H. Boddie

Gerald S.Schafer

Michael D. West